UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————————

RANDAL RITCHIE,

        Plaintiff,

v.                                               Case No. 1:11-CV-530

COLDWATER COMMUNITY SCHOOLS,         HON. GORDON J. QUIST

        Defendants.

_____/

RANDAL RITCHIE,

        Plaintiff,

v.                                               Case No. 1:11-CV-616

THE CITY OF COLDWATER,

        Defendants.

_____/

**<u>OPINION</u>**

**I. INTRODUCTION**

Plaintiff, Randal Ritchie, has sued various defendants in these consolidated cases based primarily on four 2010 incidents, three of which occurred during Coldwater Community Schools board meetings and the fourth of which occurred on school property. In his initial Complaint in case number 1:11-CV-530, Ritchie sued Coldwater Community Schools (School District), the Coldwater Community School Board (School Board), current and former School Board members, the current School District Superintendent, and the former School District Superintendent, alleging claims under 42 U.S.C. § 1983 for violation of Ritchie's First and Fourteenth Amendment rights and a state law claim for violation of the Michigan Open Meetings Act (OMA), M.C.L. § 15.261 *et seq.* Thereafter, Ritchie amended his Complaint twice, omitting certain claims and adding others. In addition, the

parties stipulated to dismiss most of the School Board members.  On July 11, 2012, the Court entered an Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss the Second Amended Complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(c).

Following the Court's rulings and additional stipulated dismissals, the following claims and Defendants remain in case number 1:11-CV-530: (1) Count I, alleging that School Board President Robin Iveson, former Superintendent David Disler, and the School Board violated Ritchie's First Amendment rights by cutting him off during the public comment portion of the May 24, 2010 School Board meeting; (2) Count II, alleging that Disler and the School Board interfered with Ritchie's First Amendment right to attend the July 12, 2010 School Board meeting by approving a police officer's June 11, 2010 verbal order banning Ritchie from the Administrative Services Center;[1] (3) Counts III and IV against current Superintendent Tina Kerr and the School Board, alleging that they violated Ritchie's First Amendment rights by causing police officers to forcibly remove him from School Board meetings on September 27, 2010, and October 25, 2010; and (4) Counts VI and IX against the School Board and Iveson, respectively, alleging OMA violations.

In case number 1:11-CV-616, Ritchie initially sued the City of Coldwater and Corporal Mark Miller.  Ritchie subsequently amended his Complaint to add Corporal Patricia Johnson, Officer Nicholas Thornton, and Officer Eastmead as Defendants.  In Count I of his Amended Complaint, Ritchie alleges that Corporal Miller—the police officer who issued the June 11, 2010 verbal order—violated Ritchie's fundamental right to travel and his First Amendment rights.  In Count II, Ritchie alleges that the City violated his First Amendment rights by adopting the trespassing ordinance that the officers applied in removing and arresting Ritchie, and by ratifying Corporal

---

[1]In its July 11, 2012 Opinion, the Court concluded that Ritchie's claim in Count II against the School District survived dismissal.  However, Ritchie now concedes that he did not sue the School District in Count II and that the School District is thus entitled to be dismissed from Count II.

Miller's verbal order. In Count III, Ritchie alleges that the City violated his Fourth Amendment rights as a result of the arrests at the September 27 and October 25 School Board meetings. In Counts IV and V, Ritchie alleges that Officers Thornton and Eastmead and Corporal Johnson violated his First and Fourth Amendment rights by removing him from the School Board meetings and arresting him. In Count VII, Ritchie alleges state law claims for false arrest and malicious prosecution against Officers Thornton and Eastmead and Corporal Johnson. Finally, in Count VIII, Ritchie requests a declaratory judgment that Ordinance 660.03 is unconstitutionally vague and overbroad.

Defendants in both cases have filed Motions for Summary Judgment requesting dismissal of all of Ritchie's claims. For the reasons set forth below, the Court will grant both motions in part and deny them in part.[2]

## II. FACTS

### A. *Ritchie Complains to the Coldwater School District*

Ritchie resides in Branch County, Michigan, and within the Coldwater Community Schools school district. Ritchie's children attended schools within the School District until the fall of 2010.

On April 22, 2010, Ritchie's daughter, who was in the Fourth grade at Jefferson Elementary School, told Ritchie that her teacher, Mrs. Renner, had pulled or tugged on her hair, causing her pain, as the class was preparing to take a math test. (Ritchie Dep. at 54–55, Coldwater Defs.' Br. Supp. Mot. Ex. A.) The following day, Ritchie took his daughter to the Coldwater Police Department (CPD) to report the hair-pulling incident as an assault and battery. (*Id.* at 67; Incident/Investigation Report, Pl.'s 530 Resp. Br. Ex. 6.)[3] Ritchie spoke with Sgt. VandenHout,

---

[2]The Court granted the parties oral argument on the instant motions, but at the hearing the parties agreed that written summary submissions rather than oral argument would be more beneficial to the Court. Therefore, the Court granted the parties the opportunity to file written arguments, which they have done.

[3]Case No. 1:11-CV-530.

who interviewed Ritchie's daughter.  Sgt. VandenHout thereafter interviewed Mrs. Renner and the school principal, Doug Bower.  At Sgt. VandenHout's request, Mr. Bower interviewed three students in Mrs. Renner's class who sat near Ritchie's daughter, but none of them saw Mrs. Renner do anything to Ritchie's daughter.  (*Id.* at 4–5.)  Sgt. VandenHout concluded that there was no evidence to support the complaint and advised Ritchie to pursue the matter with the school.  (*Id.* at 5; Ritchie Dep. at 69.)  Based on Sgt. VandenHout's report, the School District declined to take any action against Mrs. Renner.

Dissatisfied with Sgt. VandenHout's investigation, Ritchie pursued his complaint through other avenues outside the CPD, including the Michigan State Police, the Branch County Sheriff's Department, and Child Protective Services, but all declined to investigate.  (*Id.* at 82, 84.)  Ritchie also pursued the matter with the Branch County Prosecutor's office, which declined to pursue charges but advised Ritchie to take his concerns to the School Board or other agencies.  (Ritchie Aff. ¶ 21, Pl.'s 530 Resp. Br. Ex. 9.)

In the weeks following the incident, Ritchie made numerous visits to Mr. Bower at Jefferson Elementary and to Interim School District Superintendent David Disler at the Administration Services Center (ASC), demanding that they suspend Mrs. Renner and/or remove her from the classroom.[4]  (Bower Aff. ¶¶ 7, 13, 15, 18, School Dist. Defs.' Br. Supp. Ex. C.; Disler Aff. ¶¶ 4, School Dist. Defs.' Br. Supp. Ex. G.)  Each time, Ritchie followed his standard practice of recording the conversation with a concealed electronic recording device without the other party's knowledge.  (Ritchie Dep. at 84–85.)  In a meeting with Mr. Bower on April 23, 2010, Ritchie demanded that his daughter be pulled from Mrs. Renner's class and placed with another teacher.  Although Mr. Bower accommodated Ritchie's request, a day or two later Ritchie changed his mind and demanded

---

[4] During 2010, Disler served as both Chief Financial Officer and Interim Superintendent for the School District. (Disler Aff. ¶ 3, School Dist. Defs.' Br. Supp. Ex. G.)  Disler served as Interim Superintendent from January 1, 2010, until June 30, 2010, when Dr. Tina Kerr became the Superintendent.  (*Id.*)

that his daughter be placed back in Mrs. Renner's classroom and that Ritchie be allowed to sit in and observe Mrs. Renner.  (*Id.* at 96.)  Mr. Bower declined Ritchie's request to sit in Mrs. Renner's class, but apparently agreed to return Ritchie's daughter to Mrs. Renner's classroom.  (Bower Aff. ¶ 8.)  The next day, however, Ritchie and his wife, Nisha, met with Mr. Bower and requested that their daughter be placed back in the other teacher's class.  (Ritchie Dep. at 99.)

On April 26, Ritchie accompanied his daughter on a school field trip.  During the lunch break, a bus driver complained to Ritchie that Mrs. Renner had denied lunch to a student who forgot to bring a lunch from home.  (Ritchie Aff. ¶ 5.)  Ritchie found the student, who was then eating a lunch she had received from someone else, and asked the student and her paraprofessional questions about how Mrs. Renner denied the student a lunch.  (*Id.* ¶ 9.)  Later that day, Ritchie reported the lunch incident to the Michigan State Police, who, in turn, advised Mr. Bower that they did not intend to pursue Ritchie's complaint against Mrs. Renner.  (Bower Aff. ¶ 14; Ritchie Aff. ¶ 9.)  In a meeting the following day, Mr. Bower reminded Ritchie that he should avoid Mrs. Renner.  (Bower Aff. ¶ 13.)  On May 7, 2010, Disler notified Richie that he was to limit his contact with school employees to Pete Rogovich—Legg Middle School Assistant Principal—Mr. Bower, and Disler. (Letter from Disler to Ritchie of 5/7/10, Pl.'s 530 Resp. Br. Ex. 15.)

In early May, Ritchie sought out other parents who had concerns about Mrs. Renner.  During a conversation with Scott Etoll on May 1, 2010, Mr. Etoll told Ritchie about how Etoll had once used force against a teacher who was beating his brother.  (Ritchie Dep. at 114–15.)  In response, Ritchie commented that there was a time in this country when a person could shoot someone who had hurt his child and the community would back him.  (*Id.* at 113.)  A few days later, the Etolls reported to Mr. Bower that Ritchie had been to their home on two occasions trying to enlist the Etolls to make claims against Mrs. Renner, that Ritchie had told them that he owned guns and knew how to use them, that Ritchie would not leave until they ordered him to do so, and that Ritchie

appeared aggravated or aggressive.  (Bower Aff. ¶ 20.)  Mr. Etoll also told Mr. Bower about Ritchie's statement about a person shooting someone who harmed his child, although Mr. Etoll apparently said that Ritchie had referred to shooting a teacher.  (*Id.*)  Mr. Bower conveyed this information to Disler, who in turn contacted the police and requested that they conduct a risk/threat assessment of Ritchie.  (Ritchie Aff. ¶ 15.)  Subsequently, CPD Deputy Director Mark Bartell interviewed Ritchie. (Ritchie Aff. ¶ 17.) Deputy Director Bartell found Ritchie's answers "logical." (Bartell Dep. at 59, School Dist. Defs.' Br. Ex. E.)  Bartell did not conclude that Ritchie presented a threat or safety concern.  (Ritchie Aff. ¶ 17.)

### B. *May 24, 2010 School Board Meeting*

In mid-May, School Board President Robin Iveson gave Ritchie permission to speak at the May 19, 2010 School Board meeting for up to five minutes, as permitted by School Board policy. Ritchie attended the meeting but chose not to speak because the meeting was limited to a specific issue.  (Ritchie Dep. at 147–49.)

Ritchie and his wife both spoke during the regular School Board meeting on May 24, 2010. Prior to the meeting, Mrs. Renner, through her husband, requested that if Ritchie made any complaints or charges about Mrs. Renner during the public comment time, the School Board pursue the matter in a closed session as authorized by the OMA.  *See* M.C.L. § 15.268(a) (permitting a public body to meet in closed session to consider charges brought against a public officer, employee, or staff member if such person requests a closed session).  During the meeting, Ritchie's wife, Nisha, addressed the School Board about the incident involving her daughter and complained about the investigation by Mr. Bower and Disler and how the School District had treated Ritchie in response to his complaints.  (Pl.'s 530 Resp. Br. Ex. 13.)  As Nisha was commenting about the risk assessment that Disler had requested the CPD to perform, Iveson interrupted and stated that the OMA and board policy required that Nisha's allegations be addressed in a closed session because

6

Mrs. Renner had requested that complaints against her be addressed in a closed session.  A few speakers later, Ritchie addressed the School Board.  Initially, Ritchie attempted to play a secretly recorded audio recording of  his conversations with Disler and Mr. Bower.  Disler and Iveson told Ritchie to stop the recording shortly after Ritchie began to play it.  Disler told Ritchie that the recording was inaudible, that his use of the recording was inappropriate, and that Ritchie should speak if he had something to say.  Without mentioning Mrs. Renner by name, Ritchie then complained about Disler's refusal to investigate his complaint about Mrs. Renner.  Shortly thereafter, Iveson interrupted Ritchie and told him that the OMA and board rules required that his allegations be addressed in a closed session because the employee involved in his allegations had requested a closed meeting.  Ritchie denied making any allegation about Mrs. Renner or that his comments were in tandem with his wife's comments.  Ritchie and Disler then argued about whether Ritchie's comments concerned an employee, after which Ritchie explained that his comments concerned Disler's handling of his complaint.  Ritchie attempted to continue his comments, but Iveson cut him off and invoked a closed session.  Ritchie then walked away from the podium and Disler responded to Ritchie's comments.  After Disler finished his comments, Ritchie returned to the podium and finished speaking.  (*Id.*)

### C.  *June 11 Incident and its Aftermath*

On Friday, June 11, 2010, Ritchie went to the School District's Administrative Services Center (ASC) to obtain some documents in connection with a School Board meeting scheduled for June 14, 2010.  Ritchie had made arrangements to pick up the documents at the end of the day to allow the staff time to prepare the requested copies.  Ritchie arrived at the ASC at approximately 4:15 p.m.—fifteen minutes before the office closed.  (Ritchie Dep. at 175.)  Shortly after Ritchie arrived, Disler informed Ritchie that the office was closing and that he would have to return on Monday get the documents.  When Disler refused Ritchie's demand for the documents, Ritchie

called the CPD to complain that Disler was violating Ritchie's rights under the OMA. (*Id.* at 178.) Ritchie then left the building.

Ritchie began to drive away but turned around when he saw a CPD officer drive into the ASC parking lot. (*Id.* at 180, 342.) Ritchie exited his truck and had a conversation with the CPD officer, Corporal Miller. Corporal Miller told Ritchie that the issue of obtaining documents was not a police matter and that the matter was finished. (*Id.* at 183.) As Ritchie was leaving, Corporal Miller called Ritchie back and told him to stop making these calls to the police. Eventually, Corporal Miller told Ritchie that he was free to go, but Ritchie responded that he did not want to leave. (*Id.*) Corporal Miller then asked Disler, who was standing nearby, whether Disler wanted Ritchie on the school property, to which Disler responded "no." (*Id.* at 187–88.) Hearing Disler's response, Ritchie turned to leave. Corporal Miller followed Ritchie, telling him to leave the property. When Ritchie responded that he did not hear what Corporal Miller said, Corporal Miller told Ritchie to leave the property and never return. Ritchie asked Corporal Miller whether his instruction was a police order, and Corporal Miller responded that it was. (*Id.* at 184–85, 188, 190; Disler Dep. at 119–20, Pl.'s 616 Resp. Br. Ex. 3.)[5] Ritchie then left the property.

Following the June 11 incident, Corporal Miller sent an email to other CPD officers notifying them that Ritchie had been "trespassed" from the ASC and that Ritchie was subject to arrest for trespassing if he entered the property. (Email from Miller to CPD of June 12, 2010, Pl.'s 530 Resp. Br. Ex. 22.) Corporal Miller noted that Disler had given the trespass order on behalf of the School District. (*Id.*) Consistent with Corporal Miller's order to Ritchie, on June 18, 2010, Disler notified School Board members that Ritchie was prohibited from entering the ASC building, which effectively precluded Ritchie from attending the July 12, 2010 School Board meeting at the ASC. (Disler June 18, 2010 Mem., Pl.'s 530 Resp. Br. Ex. 23.)

---

[5]Case No. 1:11-CV-616.

Ritchie attended the open portion of the School Board meeting on June 14, 2009, which was held at an elementary school.  Ritchie spoke during the public comment portion of the meeting without incident.  Ritchie did not attend the monthly School Board meeting on July 12, 2010 at the ASC because of the police order threatening him with arrest if he entered the ASC.  (Ritchie Aff. ¶ 33.)

On August 4, 2010, Ritchie met with Dr. Tina Kerr, who became the new Superintendent on July 1, 2010.  Prior to the meeting, Kerr contacted Deputy Director Bartell of the CPD to inform him that she had invited Ritchie to the ASC for a meeting.  Kerr advised Deputy Director Bartell that she would notify him if Ritchie's current restrictions would be altered in the future.  (Pl.'s 530 Resp. Br. Ex. 24.)  During the meeting, Kerr lifted the ban on Ritchie's access to the ASC.  (Ritchie Aff. ¶ 35.)  Subsequently, Ritchie attended the monthly School Board meeting held on August 23, 2010 at the ASC.  Ritchie spoke during the public comment portion of the meeting without incident.  (*Id.* ¶ 36.)  On August 25, 2010, Kerr sent Ritchie a letter advising him that he was not permitted on school property without prior permission from Kerr.  (Letter from Kerr to Ritchie of 8/25/10, Pl.'s 530 Resp. Br. Ex. 27.)  However, Kerr acknowledged that Ritchie was permitted to attend School Board meetings.  (*Id.*)

### D.     *September 27 and October 25, 2010 School Board Meetings*

On September 7, 2010—the first day of school—Ritchie picketed near Jefferson Elementary School, but off school property.  (Ritchie Aff. ¶ 39.)  As Ritchie picketed, CPD officers approached him and stated that they were investigating a complaint by the School District that Ritchie was trespassing on school property.  (*Id.* ¶ 40.)

On September 27, 2010, Ritchie learned that a complaint and warrant had been issued against him for allegedly trespassing on school property on September 7, 2010.  Ritchie immediately turned himself in to the authorities, waived arraignment, and posted bond.  (*Id.* ¶ 41.)  That evening, Ritchie

went to the ASC to attend the monthly School Board meeting.  Prior to the meeting, Iveson and Kerr instructed Jackie Lyon, a school secretary, to call the police based on the CPD no trespassing order if Ritchie appeared at the meeting.  (Iveson Dep. at 29–30, Pl.'s 530 Resp. Br. Ex. 33.)  As Ritchie was sitting quietly waiting to speak during the public comment period, Kerr instructed Ms. Lyon to call the CPD and notify them that Ritchie was at the meeting and subject to an arrest warrant.  At one point, Kerr spoke to the dispatcher and said that she could not believe that Ritchie had already been picked up, booked, and released.  (Pl.'s 530 Resp. Br. Ex. 28.)  The dispatcher advised Kerr that Ritchie had in fact been booked and released on the charge.  Kerr advised the dispatcher that the School District had a "no trespassing" on Ritchie, and the dispatcher responded that she could send an officer to arrest Ritchie if that were the case.  (*Id.*)  Kerr acknowledged that the meeting was a public board meeting, but she wanted the officer's interpretation of the situation.  (*Id.*)  Officer Nicholas Thornton and Corporal Patricia Johnson were dispatched to the meeting.  Kerr told Officer Thornton that she thought Ritchie was going to make a scene during the public comment portion of the meeting because that was his "M O."  (Pl.'s 530 Resp. Br. Ex. 31.)  Kerr acknowledged that it was a public meeting, but she told Officer Thornton that she would rather not have Ritchie at the meeting.  (*Id.*)  Kerr did not tell Officer Thornton that Ritchie had her prior permission to attend the meeting.  (Kerr Dep. at 125.) Officer Thornton responded that he had no problem arresting Ritchie based on the information from Kerr.  As Ritchie was sitting in the meeting, Kerr approached him and asked him to speak with CPD officers in the hallway. Ritchie complied and left the room. Ritchie told Officer Thornton that he had a right to attend the public meeting and that he had a letter from Kerr stating that he was allowed to be on school property.  (Thornton Dep. at 57.)  Officer Thornton handcuffed Ritchie after he refused to leave the meeting and arrested him for trespassing.

On October 25, Ritchie appeared at the monthly School Board meeting at the ASC and sat quietly while waiting for an opportunity to speak during the public comment portion of the meeting.

(Ritchie Aff. ¶ 44.) During a recess, Kerr approached Ritchie and advised him that he was trespassing. Ritchie responded that it was a public meeting and then questioned President Iveson about a procedural issue, which Iveson acknowledged. Thereafter, Officer Thornton and Officer Eastmead were dispatched to the ASC. Officer Thornton spoke with Kerr, who stated that she wanted Ritchie removed from the meeting. The officers confronted Ritchie in the board room, but Ritchie refused to leave, citing his right under the OMA to attend the public meeting. (Ritchie Dep. at 276–78.) The officers then arrested Ritchie.

On October 27, 2010, the CPD issued a letter to Ritchie apologizing for arresting him at the September 27 and October 25 meetings and acknowledging Ritchie's right to attend the School Board meetings under the OMA. (Letter from Pehrson to Ritchie of 10/27/10, Pl.'s 530 Resp. Br. Ex. 36.) The following day, the City attorney requested dismissal of the charges against Ritchie arising out of the September 27 and October 25 arrests.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## IV.  DISCUSSION

**A.**     **School District Defendants (Case No. 1:11-CV-530)**

      **1.**     ***The School Board as a Proper Defendant***

At the outset, the Court addresses Defendants' argument that the School Board is not a proper defendant.  Defendants argued in their opening brief that the School Board is entitled to summary judgment on Counts I through IV of the Second Amended Complaint because Ritchie cannot demonstrate that the alleged constitutional deprivations were caused by a custom or policy of the School Board.  In their reply, Defendants argued for the first time that the School Board should also be dismissed because it is not a governmental entity that can be sued.

The Court declines to consider the latter argument because Defendants failed to raise it in their opening summary judgment brief.  As the Sixth Circuit has stated, "[i]ssues raised for the first time in a reply brief are not properly before this court."  *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993); *see also Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (noting that "we have found issues to be waived when they are raised for the first time in motions requesting reconsideration or in replies to responses").  Such issues are deemed waived.  *Blandford v. Exxon Mobil Corp.*, 483 F. App'x 153, 161 (6th Cir. 2012) (citing *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010)).  This rule applies in district court proceedings as well.  *See PNC Bank, Nat'l Ass'n v. Tyre Works-Hoffman, LLC*, No. 1:12-cv-07499, 2013 WL 678145, at *4 n.2 (N.D. Ill. Feb. 25, 2013) ("Usually, arguments raised for the first time in a reply brief are waived."); *Steele v. Heard*, 487 B.R. 302, 316 n.20 (S.D. Ala. 2013 ) ("Case law is legion for the proposition that it is generally improper for a litigant . . . to present a new, previously available argument for the first time in a reply brief.")  Moreover, Defendants did not raise the School Board's capacity to sue or be sued as an affirmative defense, and even had they done so, they should have raised the issue in their previous Motion to Dismiss, rather than sandbagging Ritchie on the issue.  Finally, to the

extent the School Board is not a suable entity, the Court determines that the appropriate remedy under the circumstances would be to treat Ritchie's claims as being asserted against the School District, rather than outright dismissal of Ritchie's claims. *See Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1061 n.1 (7th Cir. 2012) ("The Chicago Public Schools is not a suable entity. Therefore, we amend the caption of this case to reflect that the Chicago Board of Education is the proper justiciable party."); *Donaldson v. Nassau Cnty. Police Dep't*, No. 10-CV-1690 (JS) (ARL), 2010 WL 2976520, at *2 (E.D.N.Y. July 22, 2010) (stating that the plaintiff's claim against the Nassau County Police Department was "redirected against Nassau County" and ordering the clerk to "so amend the caption").

### 2. *Count I – Violation of First Amendment Rights at the May 24, 2010 Meeting*

#### a. *Iveson and Disler*

In Count I, Ritchie alleges that Disler and Iveson violated his First Amendment rights by cutting him off as he attempted to speak during the public comment portion of the May 24, 2010 School Board meeting. Disler and Iveson argue that they are entitled to qualified immunity on this claim.[6] "Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). A case directly on point is not required for the law to be clearly established. *See Ashcroft v. al-Kidd*, — U.S. — , 131 S. Ct. 2074, 2083 (2011). However, "existing precedent must have placed the statutory or constitutional question beyond

---

[6]The Court notes that Iveson and Disler do not argue that they are entitled to absolute legislative immunity. *See Strasburger v. Bd. of Educ., Hardin Cnty. Cmty. Unit Sch. Dist. No. 1*, 143 F.3d 351, 355 n.1 (7th Cir. 1998) (noting that the school board defendants were apparently entitled to absolute immunity for their legislative actions under *Bogan v. Scott-Harris*, 523 U.S. 44, 118 S. Ct. 966 (1998), but waived the defense by failing to raise it); *Timmon v. Wood*, 633 F. Supp. 2d 453, 460 (W.D. Mich. 2008) ("A city council is acting in its legislative capacity when it exercises its investigatory power by presiding over a public-comment period.").

debate." *Id.* The ultimate question is whether the governmental official had "fair warning" that his conduct violated the plaintiff's constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 740, 122 S. Ct. 2508, 2515 (2002).

As set forth in the prior Opinion, when opened to the public, a school board meeting is a limited public forum for discussion of school-related issues. *Featherstone v. Columbus City Sch. Dist. Bd. of Educ.*, 92 F. App'x 279, 282 (6th Cir. 2004) (citing *City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175–76, 97 S. Ct. 421, 426 (1976)); *see also Fairchild v. Indep. Sch. Dist.*, 597 F.3d 747, 758–59 (5th Cir. 2010) (concluding that a school board meeting, including the public comment section, fit "the hornbook definition" of a limited public forum). While the government may impose time, place and manner rules on access to such forums, the restrictions must be content neutral and narrowly tailored to serve a significant governmental interest. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46, 103 S. Ct. 948, 955 (1983). "It is . . . clearly established that content-based restrictions on speech in a public forum are subject to strict scrutiny, while viewpoint-based restrictions violate the First Amendment regardless of whether they also serve some valid time, place, manner interest." *Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006) (citing, among other cases, *Good News v. Milford Cent. Sch.*, 533 U.S. 98, 106–07, 121 S. Ct. 2093, 2100 (2001)). Moreover, the government may not mask viewpoint-based discrimination under the guise of time, place or manner regulations. *City of Madison*, 429 U.S. at 176, 97 S. Ct. at 426.

Iveson and Disler contend that they did not violate Ritchie's First Amendment rights because the audio recording was unintelligible, and allowing Ritchie to play the tape was a waste of the School Board's time and may have violated the law.[7] Iveson and Disler also contend that they interrupted Ritchie's comments pursuant to the OMA and School Board policy because they

---

[7] The Court need not decide the parties' dispute about the legality of Ritchie's recording under Michigan law, as the point is irrelevant to the Court's analysis of Count I.

reasonably believed Ritchie to be making a complaint against Mrs. Renner. The School Board policy provides:

> A person who states a complaint against a Board member, employee, or student of the District that is related directly to their job performance, duties, or the administration of the District during public comment will, as provided in these bylaws, be permitted to make the initial allegation. Thereafter, the affected board member, employee, or student may request that further discussion and/or deliberation occur in a closed session pursuant to the Open Meetings Act.

(School Board Bylaws § 1370, attached to Iveson Aff. Defs.' Br. Supp. Ex. L.)

The Court concludes that Defendants did not violate Ritchie's rights by refusing to allow him to continue playing an audio recording that Ritchie himself concedes was unintelligible. Allowing Ritchie to play the tape would have been a waste of time, and Disler thus appropriately told Ritchie to address the School Board by speaking. Moreover, the School Board policy is a valid time, place, or manner regulation. Nonetheless, the issue is whether Defendants applied the policy with an intent to suppress Ritchie's viewpoint. *See Monteiro*, 436 F.3d at 404 (noting that "if Perkins-Auguste acted with an intent to suppress Monteiro's speech on the basis of viewpoint, she violated clearly established law and is not entitled to qualified immunity"); *Timmon*, 633 F. Supp. 2d at 463 ("A defendant's motive is a question of fact that must be determined by a jury, but to survive summary judgment Plaintiff must present sufficient evidence to allow a jury to find that Defendants intended to silence her viewpoint." (internal citation omitted)).

The evidence in the record suffices to create a genuine issue of fact as to whether Iveson and Disler intended to silence Ritchie's viewpoint when they cut him off. Although Defendants contend that Ritchie was complaining about Mrs. Renner, a reasonable jury could conclude that Ritchie was complaining about Disler's refusal to investigate Ritchie's allegations against Mrs. Renner and Disler's treatment of Ritchie in response to his allegations. The video recording of the meeting shows that Ritchie was in fact complaining about Disler and never mentioned Mrs. Renner's name or the basis of his prior allegations against her. When asked if his comments were "in tandem" with

his wife's comments about Mrs. Renner, Ritchie denied that they were and told Iveson and Disler that he was not making allegations against an employee. A reasonable jury also could infer improper motive based upon Defendants' application of the School Board policy. The policy states that the complaining speaker will be permitted to make the initial allegation—presumably for the full five minutes of time that the rules allow—*after which* the affected Board member, employee, or student may request that further discussion or deliberation occur in a closed session pursuant to the OMA. Here, however, Mrs. Renner's request came *before* Ritchie made his comments, and Iveson and Disler applied the policy *before* Ritchie used his five minutes of speaking time. Finally, a reasonable jury could infer animus from Disler's warning to Ritchie that Ritchie had only three minutes of speaking time left, when Ritchie had only used about thirty seconds of his time. *Cf. Briner v. City of Ontario*, 370 F. App'x 682, 705 (6th Cir. 2010) (concluding that the evidence created an issue for the jury whether the plaintiff's First Amendment rights were violated when the city council president interrupted the plaintiff for making inappropriate comments, even though the plaintiff was addressing a legitimate issue and was not engaged in threatening or harassing behavior).

Iveson and Disler contend that Ritchie cannot show that his First Amendment rights were violated because, even after being interrupted, Ritchie continued to speak and expressed his disdain for the administration in general and Disler in particular. Iveson and Disler further note that when Ritchie finished his first speech he told the School Board that he had nothing more to say, and when he finished speaking the second time did not indicate that he had more to say. Nonetheless, an issue of fact remains as to whether Defendants precluded Ritchie from expressing his views. Disler and Iveson both interrupted Ritchie's first speech and told him that he would have to pursue his complaint in a closed session. Although Ritchie continued his speech when he spoke the second time, an issue of fact remains as to whether Ritchie was continuing his prior interrupted comments

16

or simply responding to Disler's comments.  Therefore, Iveson and Disler are not entitled to qualified immunity on Count I.

### b. *The School Board*

A governmental entity, such as the School Board, can be found liable under § 1983 only where the entity itself causes the constitutional violation at issue.  *See Monell v. New York Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037–38 (1978).  "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983."  *Springfield v. Kibbe*, 480 U.S. 257, 267, 107 S. Ct. 1114, 1119 (1987) (O'Connor, J., dissenting) (quoting *Monell*, 436 U.S. at 694, 98 S. Ct. at 2037).  Therefore, the School Board may be liable under § 1983 only if its policy or custom *caused* the alleged constitutional injury. *Monell*, 436 U.S. at 694, 98 S. Ct. at 2037–38.  For a municipal liability claim, the finding of a policy or custom is the initial determination to be made.  *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996).  A "policy" includes a "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the governmental entity.  *Monell*, 436 U.S. at 690, 98 S. Ct. at 2035–36.  For purposes of *Monell*, a government custom "is a practice 'that has not been formally approved by an appropriate decisionmaker,' but is 'so widespread as to have the force of law.'" *Parsons v. Caruso*, 491 F. App'x 597, 609 (6th Cir. 2012) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388 (1997)).  "A governmental custom or policy can be established by, among other means, evidence of official action or the agency's written policies, proof of inadequate training or supervision, or evidence that such violations are routinely tolerated."  *Copeland v. Cnty. of Franklin*, 496 F. App'x 568, 569 (6th Cir. 2012) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

Ritchie contends that he has presented sufficient evidence to show that his First Amendment injury was caused by the School Board's informal policy of automatically cutting off dissenters

critical of a staff member merely because the staff person has requested a closed session. Ritchie's evidence in this regard consists of anecdotal evidence from Audrey Burgher, a former principal in the School District, describing a former superintendent's reaction to her complaint about a male teacher's inappropriate relationship with a female student, as well as other administrators' unwillingness to investigate or take action on her complaints regarding teacher misconduct. (Burgher Aff. ¶¶ 4, 7–9, 12, 14, Pl.'s 530 Resp. Br. Ex. 2.) Ritchie also offers an affidavit from former board member Ronald Smith, who states that he recalls "persons . . . whose speech was cut off when attempting to criticize staff," but he has "never heard anyone cut off while making positive comments about staff." (Smith 2d Aff. ¶¶ 15–16, Pl.'s 530 Resp. Br. Ex. 1.) In a transcript of a recorded interviewed attached to a prior affidavit, however, Mr. Smith states that he could only remember one person prior to Ritchie who was cut off for using a staff member's name. (Smith 1st Aff. & Tr. at 9, Pl.'s 530 Resp. Br. Ex. 3.) Mr. Smith also stated that the School Board tended to ignore or minimize parent complaints regarding staff members. (*Id.* at 8.) The Court finds this evidence insufficient to establish either an official policy or custom that was "so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691, 98 S. Ct. at 2036 (internal quotation marks and citation omitted). The experiences Ms. Burgher relates in her affidavit did not pertain to School Board meetings. Moreover, although Smith describes his perceptions of the School Board's attitude toward parent complaints regarding staff, he cites only one other situation (without providing specifics) in which a speaker was cut off for using a staff member's name.

Nonetheless, the Court concludes that there is sufficient evidence to create an issue of fact regarding the School Board's liability. "A single act by a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action ordered' may suffice in demonstrating [a] policy or custom." *Cady v. Arenac Cnty.*, 574 F.3d 334, 345 (6th Cir. 2009) (first

alteration in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 481, 106 S. Ct. 1292, 1299 (1986)). As School Board President, Iveson was responsible for running School Board meetings, including applying School Board policies and rules during meetings. (Iveson Dep. at 9.) Acting for the School Board, Iveson applied the policy as the basis for cutting off Ritchie's speech. Under these circumstances, a reasonable jury could find that Iveson's acts constituted School Board policy. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 977 (9th Cir. 2010) (suggesting that the plaintiffs' ejections from a city council meeting could constitute official government policy for purposes of *Monell*); *Ward v. Athens City Bd. of Educ.*, No. 97-5967, 1999 WL 623730, at *8 (6th Cir. Aug. 11, 1999) (instructing the district court on remand to determine whether the school board's action constituted a policy for purposes of § 1983); *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 196–97 (D. Conn. 2005) (holding that the defendant's statement that he was responsible for chairing the meeting and determining the agenda sufficed to create an issue of fact whether the defendant set the policy about who spoke at board meetings, thus precluding the town's motion for summary judgment on municipal liability). Therefore, the Court will deny summary judgment to the School Board on Count I.

> ### 3. *Count II – Violation of First Amendment Rights by Disler*
>
> #### a. *Disler*

In Count II, Ritchie alleges that Disler interfered with his right to attend the July 12, 2010 School Board meeting at the ASC by approving Corporal Miller's June 11, 2010 order that Ritchie not return to the ASC. The Court previously held that Ritchie stated a claim because he alleged that Disler "authorized, acquiesced in and/or tacitly approved the order and threat of arrest when specific inquiry was made by the issuing police officer to Defendant Disler." (7/11/12 Opinion at 21.) The Court also concluded that Disler was not entitled to qualified immunity.

The record evidence shows that after Ritchie refused to leave the ASC parking lot on June 11, 2010, Corporal Miller simply asked Disler whether he wanted Ritchie on the property and Disler responded "no." Under these circumstances, there is no basis to conclude that Disler understood Corporal Miller's inquiry to extend beyond the present circumstances to future School Board meetings. In other words, Corporal Miller's inquiry did not suggest a permanent ban on Ritchie's access to the ASC. It was not until Ritchie asked Corporal Miller to repeat himself that Corporal Miller told Ritchie never to return to the ASC.

Disler contends that he is entitled to summary judgment because the evidence shows that Corporal Miller was solely responsible for the order banning Ritchie from the ASC and that Disler did not authorize an order instructing Ritchie never to return. Disler further notes that he did not prohibit Ritchie from returning to the ASC property and that Ritchie never asked Disler or the School Board to have the CPD rescind the order. Finally, Disler argues that he is entitled to qualified immunity.

Although Corporal Miller had the lawful authority to order Ritchie to leave the ASC premises when Disler confirmed that he wanted Ritchie to leave, Corporal Miller exceeded that authority by issuing an order that precluded Ritchie from exercising his clearly established First Amendment rights to attend and speak at public School Board meetings at the ASC. *See Madison Joint Sch. Dist.*, 429 U.S. at 175, 97 S. Ct. at 426; *see also Berlickij v. Town of Castleton*, 248 F. Supp.2d 335, 344 (D. Vt. 2003) ("Berlickij has a First Amendment right not to be excluded from a forum that is generally held open to the public."). A reasonable government official in Disler's position would have recognized that Corporal Miller had no basis to ban Ritchie, who had committed no crime, from the ASC for all purposes. In an analogous situation, the Sixth Circuit observed that "[a]ny competent government official, particularly a police officer, should have

20

realized that he cannot deprive a person, who has not committed a crime or violated some regulation, nor was likely to do so, of access to public grounds without due process of law." *Kennedy v. City of Cincinnati*, 595 F.3d 327, 338 (6th Cir. 2010).  While Disler was not a police officer, he should have known that Corporal Miller's order was unlawful because it precluded Ritchie from exercising his clearly established right to attend School Board meetings held at the ASC.  In fact, Disler acknowledged as much in his June 18, 2010 communication telling School Board members that the police order precluded Ritchie from attending the July 12 meeting.  Even though Disler could not have reasonably anticipated from Corporal Miller's question that Corporal Miller intended to ban Ritchie from the ASC, Disler, as the School District's chief executive official, had both the power and authority to rectify the unlawful order after it was issued.  In fact, Disler's successor, Kerr, and the CPD both recognized the Superintendent's authority to amend or rescind the no trespassing order in August 2010, when Kerr notified Deputy Director Bartell that she would advise the CPD if Ritchie's current restrictions were altered in the future.[8]

Based on the foregoing facts, Ritchie has presented sufficient evidence to establish a First Amendment violation by Disler.  The law is well established that a governmental official can be held liable under § 1983 for failure to intercede to prevent a constitutional violation if he had reason to know that a violation was occurring and had a realistic opportunity to prevent the harm.  *See Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (noting in the context of use of excessive force that a police officer may be held liable for failing to intervene "when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring").  Ritchie has shown that Disler had

---

[8]Defendants argue that the evidence shows that Ritchie, himself, was responsible for Corporal Miller's order because Ritchie returned to the ASC when he saw a police cruiser and Ritchie could have left on his own when instructed to do so without the need for a police order.  This argument lacks merit because Ritchie had every right to return to he ASC property and to stay in the parking lot unless Disler asked him to leave.  Even then, Ritchie could not have reasonably expected that his actions would result in an order forever banning him from the ASC.

reason to know that the order violated Ritchie's constitutional rights and had both the opportunity and means to prevent the harm by instructing Corporal Miller or the CPD to rescind the order, at least in part, to correct the constitutional violation. Moreover, while bystander or failure to intervene cases most often occur in excessive force cases involving police or corrections officers, *see id.*, the Court finds no reason why this basis of liability should not extend to other types of cases in which a defendant has both the opportunity and means to prevent a constitutional violation. *See Wright v. Hedgepeth*, No. C 09-4358 CW (PR), 2012 WL 4556632, at *3 (N.D. Cal. Sept. 30, 2012) (noting that if an individual who denies "a prisoner's appeals had the authority and opportunity to prevent an ongoing constitutional violation, [the prisoner] may be able to establish liability by alleging that they knew about an existing or impending violation and failed to prevent it"); *Kohn v. Sch. Dist. of City of Harrisburg*, 817 F. Supp. 2d 487, 507–08 (M.D. Pa. 2011) (concluding that the defendant- elected school board members could be held liable for constitutional violations caused by another governing body where the board members "failed to act when presented with the opportunity to fix the alleged constitutional violations").

Disler argues that even if he had authority to countermand Corporal Miller's order, he is entitled to qualified immunity because he reasonably believed that Ritchie threatened the physical safety of people on School District property. Defendants have presented no evidence that Corporal Miller's order arose out of, or was directed at, concerns that Ritchie posed a threat to others. In fact, Disler testified that his intention was simply to have Ritchie removed from the ASC for that particular day. (Disler Dep. at 92–93.) Moreover, as set forth below in the discussion regarding the September 27 and October 25 School Board meetings, there is significant evidence in the record that Ritchie was never disruptive or disrespectful at the School Board meetings he attended and did

22

not engage in threatening behavior.[9]  Accordingly, Disler is not entitled to qualified immunity on Count II.

### b.  *The School Board*

Regarding Ritchie's claim against the School Board, Ritchie has presented sufficient evidence to create an issue of fact as to whether the School Board adopted and ratified Corporal Miller's order as an official policy, either directly or by its approval of Disler's decision to maintain the order to bar Ritchie from attending the July 12 meeting.  "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 926 (1988) (plurality opinion).  As noted above, Disler advised the School Board that the order was in place against Ritchie and would preclude him from attending the July 12 meeting.  Moreover, Ritchie has presented evidence showing that the School Board considered the order to be a valid bar to Ritchie's attendance of School Board meetings.  For example, Iveson—who ran School Board meetings—testified that based on the no trespassing order, she authorized Jackie Lyon to call the police if Ritchie showed up at the September 27 meeting.  (Iveson Dep. at 28–29.)  As the Supreme Court has explained, a policy is not limited to formal rules adopted by legislative bodies, but may include a single decision by an authorized decisionmaker.

> [A] government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations.  If the decision to

---

[9]The Court recognizes that schools have an important interest in maintaining the safety and security of school grounds, as well as students, staff, parents, and other members of the public who come onto school property.  However, the Court also notes that because school board meetings involve First Amendment considerations, an unwritten policy allowing school officials to bar members of the public whom they deem to be a threat from school board meetings may constitute a prior restraint.  "A 'prior restraint' exists when the exercise of a First Amendment right depends on the prior approval of public officials."  *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 391 (6th Cir. 2001) (quoting *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 889 (6th Cir. 2000)).  To be valid, a prior restraint must contain some objective criteria to cabin the discretion of the officials charged with its enforcement.  *See Staub v. City of Baxley*, 355 U.S. 313, 322, 78 S. Ct. 277, 282 (1958).  In this regard, unwritten policies or practices lacking objective standards are particularly susceptible to judicial scrutiny because they afford the decisionmaker "limitless discretion."  *Niemotko v. Maryland*, 340 U.S. 268, 271–72, 71 S. Ct. 325, 327 (1951).

> adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood.  More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.

*Pembaur*, 475 U.S. at 481, 106 S. Ct. at 1299 (footnote omitted).  Based on the foregoing evidence, a reasonable jury could conclude that the School Board adopted the order—which caused the constitutional violation—as its official policy.

> ### 4.  *Counts III and IV – Violation of First Amendment Rights by Kerr*
>
> #### a.  *Kerr*

Ritchie alleges in Counts III and IV that Kerr violated his First Amendment rights by having CPD officers forcibly remove him from the September 27 and October 25, 2010 School Board meetings.  As the Court has previously noted, Ritchie had a right to attend and speak at School Board meetings so long as he was not creating a disturbance.  *Hansen v. Westerville City Sch. Dist. Bd. of Educ.*, Nos. 93-3231, 93-3303, 1994 WL 622153, at *8 (6th Cir. Nov. 7, 1994) (per curiam); *see also Green v. Nocciero*, 676 F.3d 748, 754 (8th Cir. 2012) ("But having chosen to conduct its business in public and to hear citizen views, the Board could not deny access to the meeting and, while it could limit the subject matter of citizen comments, it could not discriminate against a speaker based on his viewpoint.") (citing *City of Madison*, 429 U.S. at 176, 97 S. Ct. at 176); *cf. Leonard v. Robinson*, 477 F.3d 347, 361 (6th Cir. 2007) (holding that "no reasonable officer would find that probable cause exists to arrest a recognized speaker at a chaired public assembly based solely on the content of his speech (albeit vigorous or blasphemous) unless and until the speaker is determined to be out of order by the individual chairing the assembly").

It is undisputed that Ritchie was not creating a disturbance at either meeting at the time Kerr

requested CPD officers to remove Ritchie.[10]  In fact, Iveson testified that she never declared Ritchie

out of order at any School Board meeting, and she confirmed that Ritchie never engaged in any

disruptive or disrespectful behavior during the September 27 and October 25 meetings.  (Iveson

Dep. at 18, 23–24.)  Finally, to the extent a disturbance occurred at either meeting, record evidence

shows that resulted solely from  Kerr's decision to have police officers remove Ritchie from the

meetings.

Relying on many of the same cases the Court has previously distinguished as inapplicable

in the First Amendment context, *see, e.g. Cole v. Buchanan Cnty. Sch. Bd.*, 328 F. App'x 204, 207

(4th Cir. 2009); *Lovern v. Edwards*, 190 F.3d 648, 655 (4th Cir. 1999), Defendants argue that Kerr

had a valid basis to remove Ritchie from the meetings because Kerr determined that Ritchie

presented a "clear and present danger" to those attending the meeting and she therefore had Ritchie

removed "for reasons narrowly tailored to serve significant government interests, and that were

'content neutral.'" (Defs. Br. Supp. Mot. at 19.)  Defendants contend that Kerr reasonably believed

that Ritchie posed a threat because, among other things:

- Ritchie was angry at Mrs. Renner for harming his daughter and he refused to accept Mr. Bower's and Disler's conclusions.
- Ritchie demanded that his daughter be removed from Mrs. Renner's class and then requested that she be returned to Mrs. Renner's classroom.
- Ritchie stated to the Etolls that there was a time in this country when a person could shoot someone who had hurt his child and the community would back him.
- Ritchie made School District personnel aware that he owned guns, wore a holster (without a gun) onto school property, and told a school secretary that he shot ammunition.
- Disler asked the CPD to conduct a risk/threat assessment of Ritchie.
- Ritchie demanded that Mrs. Renner, Mr. Bower, and Disler be punished for complaints the CPD concluded were unfounded.

---

[10]Defendants do not seriously dispute that Ritchie was not creating a disturbance at either meeting before Kerr summoned the police and asked them to remove Ritchie.  Defendants argue that Ritchie breached the peace during the September 27 meeting by refusing to walk down the hall to speak with Officer Thornton and during the October 25 meeting by refusing to leave the meeting room when Kerr told Ritchie that he was trespassing.  Again, however, Defendants have not shown that Ritchie did anything to disturb either meeting before being asked to leave, and the Court concludes that a reasonable jury could find that Kerr instigated any disturbance, to the extent that one occurred.

- Ritchie was unwilling to resolve his issues with school personnel on any basis other than his own demands.
- Ritchie demonstrated abrupt mood swings.
- Ritchie appeared to engage in stalking behavior.

(*Id.* at 24–25.)[11]  On the other hand, it is undisputed that as of the September 27 meeting, Ritchie had attended at least four prior School Board meetings and was never ruled out of order, was not disruptive, and did not threaten anyone, including School Board members and the general public. Moreover, in her conversation with Officer Thornton on September 27, referring to Ritchie, Kerr said that "it's our understanding that he's gonna make a scene during public comment because that's what his M O is."  (Pl.'s 530 Resp. Br. Ex.31.)  In fact, the evidence shows that Ritchie's "M. O." was speaking during the public comment portion of School Board meetings without creating a disturbance.  This evidence tends to show that Kerr's concern was not safety, but the content of Ritchie's speech during the public comment period.

### b. *The School Board*

Defendants argue that Ritchie has not shown that Kerr acted pursuant to School Board policy or custom in having Ritchie removed from the meetings.  Defendants emphasize that the School Board, rather than Kerr, possesses final policy making authority for the school.  *See* M.C.L. § 380.11a(3),  (5).  The Court concludes that Ritchie has presented sufficient evidence to create an

---

[11]In a supplemental brief, the School District Defendants request that the Court consider Ritchie's mental health records from his Social Security case in ruling on their motion.  The Court declines to consider these records for several reasons.  First, there is no indication that Kerr or Disler were aware of these records prior to the instant litigation. Defendants argue that Kerr acted reasonably in having Ritchie removed from the meetings because she had an objectively reasonable basis to conclude that Ritchie presented a threat.  Because Kerr was unaware of these records and did not consider them in making her determination, they have no bearing on the issue. *Cf. Barner v. City of Harvey*, No. 95 C 3316, 1999 WL 1069146, at *1 (N.D. Ill. Nov. 18, 1999) ("Under the after-acquired evidence rule, evidence that the defendants did not have at the time of the termination is not admissible to prove that the defendants fired plaintiffs for a legitimate business reason.") (citing *McKennon v. Nashville Bus. Publ'g Co.*, 513 U.S. 352, 360, 115 S. Ct. 879, 885 (1995)). Second, Defendants have not adequately explained how these records should inform the summary judgment analysis.  The Court's task in deciding a summary judgment motion is to determine whether an issue of fact remains for the jury, not to conduct some sort of administrative review to determine whether substantial evidence supported Kerr's alleged threat determination.  Finally, even if the Court were to consider Ritchie's mental health records, summary judgment still would not be warranted because the record contains sufficient evidence for a jury to conclude that Ritchie did not pose a threat to others at School Board meetings.

issue of fact whether his removal from the September 27 and October 25 meetings was caused by School Board policy. As explained above, there is sufficient evidence to allow a reasonable jury to conclude that the School Board ratified or adopted the CPD's no trespassing order as its own policy. Iveson testified that she relied on the order in authorizing a secretary to call the police if Ritchie appeared at the September 27 meeting. *See Ross v. United States*, 910 F.2d 1422, 1430 (7th Cir. 1990) ("Where a particular course of action is authorized by a municipality's authorized decisionmakers, it represents a policy rightly attributed to the governmental entity, and in such a case there is no need to resort to proof of the policy's multiple applications to attribute its existence to the municipality."). Therefore, the Court will deny the School Board summary judgment on Counts III and IV.

### 5. *Counts VI and IX – Open Meetings Act Claims*

#### a. *The School Board*

In its July 11, 2012, Opinion, the Court concluded that Ritchie stated a valid claim against the School Board under Section 11 of the OMA based on a November 22, 2010 regular School Board meeting. Ritchie alleged that during the public meeting the board adjourned to meet in "executive session" to "consider material exempt from discussion or disclosure by state or federal statute." M.C.L. § 15.268(h). Ritchie alleges that during the closed meeting, the School Board discussed a proposed resolution to ban Ritchie from entering all school property and took an informal poll of the School Board members, which turned out to be 4–3 against the resolution. This Court concluded that Ritchie stated a valid claim because he alleged that the closed meeting involved a quorum of the School Board and the meeting involved deliberations and an informal poll on a matter of public policy.

Pursuant to Section 8 of the OMA, a public body may meet in a closed session to deliberate various matters, including "material exempt from discussion or disclosure by state or federal law."

27

M.C.L. § 15.268(h). Such material includes a written legal opinion within the attorney-client privilege. *Booth Newspapers, Inc. v. Wyoming City Council*, 168 Mich. App. 459, 467, 425 N.W.2d 695, 699 (1988). Although deliberations concerning matters covered by Section 8 "may take place in closed session, all actual votes and decisions must be made in an open meeting." *Titus v. Shelby Charter Twp*, 226 Mich. App. 611, 616, 574 N.W.2d 391, 393 (1998).

The record evidence shows that the School Board entered into an executive session during the November 22, 2010 meeting to consider a matter covered by the attorney-client privilege—specifically, a written legal opinion addressing the possibility of obtaining an order prohibiting Ritchie from accessing school property.[12] (Iveson Dep. at 58–59, Defs.' Reply Br. Ex. S; Smith 1st Aff. & Tr. at 26.) Although Ritchie alleges that the School Board took an informal poll during the closed meeting as an intended resolution of the matter, the evidence does not support this allegation. Rather, the evidence shows that the board members deliberated the issue but never took any action that might constitute a "decision" as defined by the OMA. *See* M.C.L. § 15.262(d). Ritchie's evidence—the transcript of former board member Smith's statement to Ritchie's counsel—shows that board members simply discussed the issue without entertaining a formal motion or otherwise taking any action on the issue. (Smith 1st Aff. & Tr. at 25.) Accordingly, the Court concludes that the School Board did not violate the OMA during the closed session held on November 22, 2010. Therefore, the Court will grant the School Board summary judgment on Count VI.

### b. *Iveson*

The other remaining OMA claim is against Iveson under Section 13. Section 13(1) of the OMA provides that "[a] public official who intentionally violates this act shall be personally liable

---

[12]The Court assumes that the matter concerned obtaining a court order, since the CPD had already issued an order, albeit an unlawful one, banning Ritchie from the ASC building for all purposes.

in a civil action for actual and exemplary damages of not more than $500 total, plus court costs and actual attorney fees to a person . . . bringing the action." M.C.L. § 15.273(1). Section 3(5) of the OMA provides that "[a] person shall be permitted to address a meeting of a public body under rules established by the public body." M.C.L. § 15.263(5). Ritchie contends that Iveson violated this section by interrupting him during the May 24, 2010 meeting.

Defendants contend that Iveson is entitled to summary judgment on this claim because Ritchie has not shown that Iveson intended to violate the OMA. Defendants argue that the evidence shows that Iveson intended to comply with the OMA.

In order to prove a violation under Section 13, a defendant "must have a subjective desire to violate the OMA or knowledge that the offender is committing an act violative of the OMA." *People v. Whitney*, 228 Mich. App. 230, 255–56, 578 N.W.2d 329, 341 (1998). Based on the evidence in the record, the Court concludes that whether Iveson violated the OMA during the May 24 meeting and Iveson's subjective intent or desire are issues for the jury. As discussed above regarding Count I, the evidence is sufficient to permit a reasonable jury to conclude that Ritchie was not complaining about Mrs. Renner and that Disler and Iveson improperly interrupted his comments. This same evidence, combined with Ritchie's statement that he was not complaining about Mrs. Renner would allow a reasonable jury to infer that Iveson knew that she was violating the OMA by cutting off Ritchie's comments. Therefore, the Court will deny summary judgment to Iveson on Count IX.

### 6. *Punitive Damages*

Defendants contend that Ritchie's punitive damage claims against the School Board must be dismissed because they are not available as a matter of law. Ritchie wisely does not dispute this point because the Supreme Court has held that a plaintiff may not recover punitive damages against municipalities in a § 1983 lawsuit. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101

S. Ct. 2748, 2762 (1981); *see also Long v. Fulton Cnty. Sch. Dist.*, 807 F. Supp. 1274, 1290 (N.D. Ga. 2011) ("FDSD, a public school district, undoubtedly falls within the scope of [*City of Newport*]."). Therefore, the Court will dismiss Ritchie's punitive damages claim against the School Board. To the extent Defendants also request that Ritchie's punitive damages claims be dismissed as to Iveson, Disler, and Kerr, the Court will defer its ruling until trial.

**B.     City Defendants (Case No. 1-11-CV-616)**

**1.     *Count I – Corporal Miller***

In Count I of his Amended Complaint, Ritchie alleges that Corporal Miller violated his constitutional rights in several respects by issuing the June 11, 2010 no trespassing order. The Court interprets Ritchie's Amended Complaint to allege that the order violated Ritchie's fundamental right to travel, his substantive due process right to be free from arbitrary and capricious government action, and his First Amendment rights to access publicly available information and to access the ASC in order to attend the July 12, 2010 School Board meeting. As the Court understands Ritchie's response, however, Ritchie limits the theories of his claim to violation of his right to intrastate travel and violation of his First Amendment rights of access to publicly-available records and to access the ASC to attend School Board meetings.[13] Defendants contend that Ritchie's claim fails as a matter of law and that Corporal Miller is entitled to qualified immunity.

Ritchie's claim fails to the extent it relies on a right to intrastate travel. As the Sixth Circuit has explained, the right to intrastate travel is limited to "the right to travel locally through public spaces and roadways." *Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002). Ritchie does not claim that Corporal Miller's order interfered with his right to travel through public spaces and roadways. Instead, Ritchie's claim is that the order prevented him from accessing the ASC—a

---

[13]Ritchie briefly refers to a due process claim but fails to develop the argument.

specific government building. Ritchie cites no authority for the proposition that the right to travel, whether interstate or intrastate, includes the right to access particular government buildings or offices. To the contrary, courts have held that the right to travel does not encompass the right to access particular government property. For example, in *Thompson v. Ashe*, 250 F.3d 399 (6th Cir. 2001), the Sixth Circuit rejected the plaintiff's claim that a public housing authority's no-trespass policy, which precluded the plaintiff from accessing a housing development, infringed his right of interstate travel. The court observed that "[t]he no-trespass policy restricts Thompson's travel only with regard to his being on [the defendant's] property. Thompson's inability to visit twelve housing developments in Knoxville obviously does not burden his right to travel interstate." *Id.* at 406. Similarly, in *Hannemann v. Southern Door County School District*, 673 F.3d 746 (7th Cir. 2012), the Seventh Circuit held that an indefinite ban barring the plaintiff from school property did not violate the plaintiff's right to intrastate travel. The court observed that "[t]he right to intrastate travel protects the right to move from place to place, not the right to access certain public places." *Id.* at 757. The *Hannemann* court cited *Williams v. Town of Greenburgh*, 535 F.3d 71 (2d Cir. 2008), in which the court held that "a municipality's decision to limit access to its facilities does not interfere with the right to free movement." *Id.* at 76. The *Williams* court noted that cases concerning the right to intrastate travel pertain to the freedom of movement "between places otherwise open to their presence." *Id.* The court thus observed that "it would distort the right to free travel beyond recognition to construe it as providing a substantive right to cross a *particular* parcel of land, enter a *chosen* dwelling, or gain admittance to a *specific* government building." *Id.* (emphasis in original) In light of these cases, Corporal Miller's order did not violate Ritchie's right of intrastate travel.

Defendants also contend that Ritchie's claim fails to the extent he alleges that the order violated his First Amendment right to obtain or view public documents and information from the ASC, such as public notices and minutes. Ritchie's First Amendment claim in this regard relies on

31

the OMA's requirement that a public body, such as a school district, make notices, minutes, and other documents available for inspection by the public.  *See* M.C.L. §§ 15.264, 15.269.

Although the First Amendment "protects the people's right to know that their government acts fairly," *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002), there is no freestanding right under the First Amendment to access records or information within the government's possession.[14] *See S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 533, 560 (6th Cir. 2007) (noting that "'[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control'" (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 15, 98 S. Ct. 2588, 2597 (1978) (Burger, C.J., plurality))); *Lanphere & Urbaniak v. Colorado*, 21 F.3d 1508, 1511 (10th Cir. 1994) (noting that "there is no constitutional right, and specifically no First Amendment right, of access to government records"); *Herald Co. v. McNeal*, 511 F. Supp. 269, 273 (E.D. Mo. 1981) ("This Court must conclude that plaintiff has no constitutional right of access to the information it now seeks.").  Moreover, the Supreme Court has explained that "[t]he Constitution . . . is neither a Freedom of Information Act nor an Official Secrets Act." *Houchins*, 438 U.S. at 14, 98 S. Ct. at 2596 (Burger, C.J., plurality).

To the extent Ritchie suggests that he may premise a First Amendment claim on the OMA's disclosure requirements, his argument must fail.  As the Sixth Circuit has recently observed, "a violation of state law does not necessarily create a constitutional violation." *Moore v. Mitchell*, 708 F.3d 760, 798 (6th Cir. 2013); *cf. United States v. Beals*, 698 F.3d 248, 264 (6th Cir. 2012) (holding that a defect in warrant under state law does not require suppression in a federal criminal proceeding because the state-law defect did not violate the Fourth Amendment).  Courts that have considered

---

[14]The courts have recognized that the First Amendment protects the right to receive information and ideas. *See Neinast v. Bd. of Trs. of the Columbus Metro. Library*, 346 F.3d 585, 591 (6th Cir. 2003).  However, in terms of access to government-maintained information, this right is primarily limited to access to public libraries. *See id.*

First Amendment claims similar to Ritchie's claim in this case—premised on state open meetings or freedom of information acts—have concluded that state disclosure laws do not create First Amendment rights.  For example, in *Shero v. City of Grove*, No. 05-CV-0137-CVE-PJC, 2006 WL 3196270 (N.D. Okla. Nov. 2, 2006), *aff'd*, 510 F.3d 1196 (10th Cir. 2007), the plaintiff alleged that the defendants' denial of his request for city council packets violated his First Amendment right to petition the government.  The court rejected the argument, noting that "it is well-settled that there is no general First Amendment right of access to all sources of information within governmental control," *id.* at *3 (internal quotation marks omitted), even though the Oklahoma Open Meetings Act granted the plaintiff the right to obtain information from state and local governments.  *Id.*  The court further noted the absence of case law supporting a First Amendment right to obtain information from a government body.  *Id.*  Similarly, in *Schuloff v. Fields*, 950 F. Supp. 66 (E.D.N.Y. 1997), the court rejected the plaintiff's First Amendment claims based on a violation of the New York Freedom of Information law.  The court stated that "[w]hile the Supreme Court recognizes an implicit First Amendment right of access to certain information relating to criminal trials, the Court has never extended that right to encompass all government records."  *Id.* at 68 (internal citation omitted).  Like the *Shero* court, the *Schuloff* court noted the lack of any case "support[ing] a broad right of access under the First Amendment to information of the sort sought here."  *Id.*; *see also Berlickij v. Town of Castleton*, 248 F. Supp. 2d 335, 344 (D. Vt. 2003) (holding that town officials were entitled to qualified immunity on the plaintiff's First Amendment claims because they "could reasonably have believed that a violation, even an intentional violation, of Vermont's Open meeting law could not implicate the First Amendment").  Accordingly, the Court concludes that Ritchie cannot maintain a First Amendment claim based on a denial of access to documents required to be made available to the public under the OMA.

33

As for the remaining aspect of Ritchie's First Amendment claim, Ritchie has a First Amendment right to attend and speak at School Board meetings.  *See id.* ("Berlickij has a First Amendment right not to be excluded from a forum that is generally held open to the public."). Because the ASC is the regular site of School Board meetings, Ritchie's right to attend and speak at those meetings necessarily included a limited right to access the ASC to attend the meetings. Because Corporal Miller's order banned Ritchie from entering the ASC for all purposes, the order violated Ritchie's First Amendment rights.

The City Defendants argue that Corporal Miller's order was lawful because City of Coldwater Ordinance § 660.03 authorized Miller to issue the order at Disler's request.  The Ordinance provides, in pertinent part: "Any person who is on the grounds of a private, public or parochial school, or a building thereof, shall leave when requested to do so by the principal, assistant principal or other person responsible for the building, without the necessity of reasons being assigned for such request to leave."  (City Defs.' Br. Supp. Mot. Ex. M.)  Defendants are correct that Ordinance 660.03 provided a valid basis for Corporal Miller to order Ritchie from the ASC property when Disler confirmed that he wanted Ritchie to leave.  However, even if the Ordinance arguably provided a valid basis for a broader continuing order banning Ritchie from the ASC,[15] Corporal Miller could not rely on the Ordinance to preclude Ritchie from accessing the ASC in order to exercise his clearly established rights to attend and speak at School Board meetings.

Defendants also contend that Ritchie has no claim against Corporal Miller because Disler authorized the order, and all parties recognized that only Disler or another authorized school representative could rescind the order.  As the Sixth Circuit has observed, however, "'since World

---

[15]Although Ritchie contends that the ordinance conflicts with, and is superseded by, the OMA to the extent it affects Ritchie's right to attend open meetings, the Court need not decide that issue for purposes of its First Amendment analysis.

War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order.'" *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) (quoting *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004) (internal quotation marks and citations omitted)).  Here, regardless of Disler's authority or directive to Corporal Miller, Corporal Miller was still required to assess for himself whether his actions violated clearly established law.  *Id.*

Finally, regarding Defendants' assertion that Corporal Miller is entitled to qualified immunity, the Court concludes that Corporal Miller is entitled to qualified immunity only with regard to the alleged violations of Ritchie's right of intrastate travel violation and denial of access to information and documents under the First Amendment, as Corporal Miller's actions did not violate clearly established constitutional rights of which a reasonable police officer would have been aware.  *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009).  However, for the foregoing reasons, Corporal Miller is not entitled to qualified immunity insofar as Ritchie alleges that the order violated his right to attend School Board meetings at the ASC.

### 2. *Count V – Fourth Amendment Claims against Defendants Thornton, Johnson, and Eastmead*

In Count V, Ritchie alleges that Officers Thornton and Eastmead and Corporal Johnson violated his Fourth Amendment right to be free from unreasonable seizures by arresting him without probable cause.  "Probable cause is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'"  *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).  In assessing probable cause in the context of a warrantless arrest, a police officer need not "investigate independently every claim of innocence."  *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir.

2000).  Once an officer determines that the facts and circumstances give rise to probable cause, the officer has no further duty to investigate or to search for exculpatory evidence. *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999).  However, in making the initial probable cause determination, the officer must consider "both the inculpatory *and* exculpatory evidence" known to the arresting officer. *Gardenhire*, 205 F.3d at 318 (emphasis in original).  This means that the officer's probable cause determination must include "'facts and circumstances establishing a statutorily legitimated affirmative justification for the suspected criminal act.'" *Fridley v. Horrighs*, 291 F.3d 867, 873 (6th Cir. 2002) (quoting *Painter v. Robinson*, 185 F.3d 557, 570 (6th Cir. 1999)).  Police officers are not required to conduct "quasi-trials" as a prerequisite to a warrantless arrest, but they cannot ignore information that would alert a reasonable officer that the suspect's behavior is protected by a legally cognizable affirmative defense. *Id.*  "[W]hen we refer to whether an officer would conclusively know that the defendant is protected by an affirmative defense, we have focused entirely on the facts and circumstances known to the officer at the time of the arrest; not on the officer's knowledge, or lack thereof, of the statute that provides the defense. *Knowledge of the statute is imputed to the police officer.*" *Pritchard v. Hamilton Twp. Bd. of Trs.*, 424 F. App'x 492, 506 (6th Cir. 2011) (italics added).  Probable cause is an issue of fact for the jury to resolve if there are any genuine issues of material fact that are relevant to the inquiry. *Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir. 2006).

Defendants contend that they are entitled to summary judgment because they were authorized to arrest Ritchie under Ordinance 660.03.  Defendants argue that they were authorized to arrest Ritchie once Kerr asked Ritchie to leave and he refused to do so.  Contrary to Defendants' argument,  however, Ritchie's evidence creates an issue of fact as to whether Defendants lacked probable cause to arrest Ritchie.  First, there is no evidence that Kerr asked Ritchie to leave, at least

36

at the September 27 meeting, as required by the Ordinance. But even if she had requested him to do so, the officers still lacked probable cause to arrest Ritchie. As set forth above, Ritchie had a right, both under the First Amendment and the OMA, to attend the public School Board meeting unless he was creating a disturbance. It is undisputed that prior to the time Kerr summoned Defendants to the ASC, Ritchie was not creating a disturbance. In fact, during the September 27 meeting, Kerr told Officer Thornton that Ritchie's M.O. was that *he was going to create a scene* during the public comment portion, not that he was creating, or had already created, a scene. Moreover, Kerr expressed to Officer Thornton her hesitation in having the police remove Ritchie because the meeting was a public meeting. Ritchie also asserted to Officer Thornton that he had a right under the OMA to attend the public meeting. Finally, for the reasons set forth above, in arresting Ritchie, Defendants could not reasonably rely on Corporal Miller's no-trespassing order or on Kerr's statements that she did not want Ritchie on the premises.

Defendants also argue that they are entitled to qualified immunity. Under these facts, however, no reasonable police officer would have believed that he could have arrested Ritchie, even if Kerr had asked Ritchie to leave the meeting. *Cf. Leonard*, 477 F.3d at 361 (holding that no reasonable officer would have concluded that probable cause existed to arrest a recognized speaker at a public meeting based solely on his speech unless and until the individual chairing the meeting determined the speaker to be out of order). Defendants argue that Ordinance 660.03 had not been invalidated and is not so grossly unconstitutional that any reasonable person would know that it was flawed. Defendants are correct that, on its face, the Ordinance is not invalid. However, reasonable police officers would have known that Ordinance 660.03, or any trespassing law, cannot be used to remove a person from a public meeting if that person has not disturbed the meeting or been declared out of order. Finally, Defendants should have been aware that the OMA gave Ritchie the right to attend the public meeting.

37

3. ***Count IV – First Amendment Claims against Thornton, Johnson, and Eastmead***

Defendants contend that they are entitled to summary judgment on Ritchie's First Amendment claims in Count IV. Ritchie alleges that Defendants violated his First Amendment rights by participating in his removal from the School Board meetings. Ritchie had a First Amendment right to attend the meetings. Defendants argue that it was not their job to determine the constitutionality of the decision to have Ritchie removed from the meeting. As discussed above, however, Defendants cannot shirk liability by pointing the finger at Kerr. Defendants had an obligation to determine whether their own conduct was constitutional. As noted, Ritchie has presented sufficient evidence to show that Defendants Thornton, Johnson, and Eastmead lacked any justifiable reason to remove Ritchie from the School Board meetings. Defendants also argue that there is no evidence that they arrested him based on the content of his speech, but this is irrelevant to Ritchie's claims because Ritchie had a right to attend the meeting even if he did not plan to speak.

Defendants further contend that they are entitled to qualified immunity, but this argument fails because reasonable police officers would have known that they could not have arrested Ritchie unless he was creating a disturbance at the meetings. Defendants' reliance on *Green v. Nocciero*, 676 F.3d 748 (8th Cir. 2012), is misplaced because *Green* is distinguishable from this case. In *Green*, the court held that the police officers were entitled to qualified immunity because they reasonably relied on information from the school's head of security that the plaintiff was being disruptive and had refused to leave the meeting. *Id.* at 751. There is no such evidence in this case.

4. ***Counts II and III – City of Coldwater***

Count II of the Amended Complaint pertains to the City of Coldwater. The grounds for the claim are not entirely clear. On one hand, Ritchie appears to allege that the City is liable simply for passing Ordinance 600.03 and/or failing to amend it to include a provision stating that it is not

applicable to school meetings that are open to the public.  On the other hand, Ritchie appears to allege that Ordinance 600.03 was the moving force behind the alleged constitutional deprivations. The City moves for summary judgment on Count II, arguing that the mere existence of Ordinance 600.03 does not result in a constitutional violation.  The City concedes that the Ordinance could be applied in an unconstitutional manner, but it contends that if a constitutional violation occurred, it was caused by school officials, rather than the City's police officers.

To the extent Ritchie alleges that the City is liable simply for passing the ordinance or failing to amend it to include a provision stating that it is not applicable to public school meetings, Ritchie's claim fails because such conduct does not give rise to a constitutional violation.  The Ordinance is not facially invalid, nor is there any reason to conclude that the Ordinance, standing alone, violates Ritchie's rights.  On the other hand, as the City concedes, the Ordinance may be applied in such a way that a constitutional violation results.  Contrary to the City's assertion, however, Ritchie has presented sufficient evidence to show that school officials *and* the City's police officers engaged in conduct that resulted in constitutional violations.  In this regard, Ritchie has demonstrated a basis to hold the City liable for the alleged violations because the Ordinance constitutes a policy of the City that was the moving force behind all of the alleged constitutional violations by its police officers.  Moreover, Ritchie has presented evidence that the City, through its police department, adopted Corporal Miller's unlawful order as its official policy or custom when, on June 25, 2010, Deputy Director and Internal Affairs Inspector Bartell reiterated the order instead of repealing it. In fact, the evidence shows that the City's police department recognized the order as a continuing ban on Ritchie's access to the ASC under all circumstances.  The City's police department continued to recognize and enforce the unlawful order when its officers subsequently arrested Ritchie at the September and October School Board meetings.  Accordingly, the City is not entitled to summary

judgment on Count II insofar as it pertains to the City's liability for its officers' actions.

Ritchie also asserts a claim against the City in Count III pertaining to the Fourth Amendment violations.  For the reasons cited with regard to Count II, the Court also concludes that the City is not entitled to summary judgment on Count III.

### 5. *Count VIII – Claim for Declaratory Relief*

Although Defendants do not specifically address Ritchie's claim for declaratory relief in their Motion for Summary Judgment, the Court has reviewed it and concludes that the claim should be dismissed.  In Count VIII, Ritchie seeks a declaratory judgment that Ordinance 660.03 is unconstitutionally vague or overbroad.  Ritchie further seeks a ruling that Ordinance 660.03 expressly conflicts with the OMA.  Ritchie requests that the Court declare the Ordinance void.

"[A]n enactment is void for vagueness if its prohibitions are not clearly defined." *600 Marshall Entm't Concepts, LLC v. City of Memphis*, 705 F.3d 576, 586 (6th Cir. 2013) (internal quotation marks omitted).  Ordinance 660.03 is not unconstitutionally vague or overbroad.  Its commands are simple and clear—a person on school grounds must leave when requested to do so by the school official responsible for the building.  Moreover, contrary to Ritchie's lone allegation regarding vagueness, (*see* Am. Compl. ¶ 105), Ordinance 660.03 is not directly concerned with speech.

Ritchie's overbreadth argument also fails.  In an overbreadth challenge, "[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S. Ct. 2908, 2916 (1973).  "To show that a statute is unconstitutionally overbroad, plaintiffs must demonstrate from the text of the statute and from actual

fact that a substantial number of instances exist in which the law cannot be applied constitutionally." *Am. Booksellers Found. for Free Expression v. Strickland*, 601 F.3d 622, 627 (6th Cir. 2010) (quoting *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 336 (6th Cir. 2009) (en banc) (internal quotation marks and alterations in original omitted)). A law will be deemed overbroad and facially invalid only if it proscribes a substantial amount of constitutionally protected speech as compared to the law's "plainly legitimate sweep." *Phelps-Roper v. Strickland*, 539 F.3d 356, 360 (6th Cir. 2008) (citing *Virginia v. Hicks*, 539 U.S. 113, 118–19, 123 S. Ct. 2191, 2196 (2003)). The Supreme Court has observed that invalidation on overbreadth grounds is "[r]arely, if ever," appropriate where the challenged law or regulation "is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Hicks*, 539 U.S. at 124, 123 S. Ct. at 2199.

Ritchie's overbreadth challenge is not appropriate in this case because Ritchie does not challenge the Ordinance as burdening the expressive conduct of others, but instead alleges that it is unlawful as applied to his own First Amendment activity. *See de la O v. Hous. Auth. of City of El Paso*, 417 F.3d 495, 505–06 (5th Cir. 2005) (noting the inapplicability of an overbreadth challenge because the plaintiff's claim "is predicated on her own supposed injury resulting from the alleged unconstitutionality of the HACEP regulations). Even if an overbreadth challenge were proper in this case, the challenge would fail because Ordinance 660.03 concerns physical presence on school property, not conduct relating "to speech or to conduct necessarily associated with speech (such as picketing or demonstrating). *Hicks*, 539 U.S. at 124, 123 S. Ct. at 2199. School buildings are not traditional public forums, *see Culbertson v. Oakridge Sch. Dist. No. 76*, 258 F.3d 1061, 1064 (9th Cir. 2001); *Good News/Good Sports Club v. Sch. Dist. of City of Ladue*, 28 F.3d 1501, 1513 (8th Cir. 1994), so it is highly unlikely that the Ordinance proscribes a substantial amount of

constitutional activity in relation to its legitimate purpose of excluding unauthorized persons from school grounds.

Finally, as for Ritchie's allegation that the Ordinance is void because it expressly conflicts with the OMA, there is no support for such a conclusion.  Although the Ordinance may be applied in a manner contrary to the OMA by unlawful exclusion of persons from open school board meetings, the Ordinance covers substantially more conduct that is not covered by the OMA. Moreover, the OMA does not supersede the Ordinance, as Ritchie alleges, because the Ordinance does not "relate to requirements for meetings of local public bodies to be open to the public." M.C.L. § 15.261(2).

### 6.    *Count VII – False Arrest and Malicious Prosecution*

In Count VII, Ritchie alleges state law claims for false arrest and malicious prosecution. Defendants argue that they are entitled to summary judgment on these claims on the basis of governmental immunity.  Ritchie did not address these claims in his response.  During the hearing on the instant motions, Ritchie's counsel explained that he did not address the false arrest and malicious prosecution claims due to page constraints.  However, Ritchie could have requested an extension of the page limitations, as other parties have done in these cases.

Ritchie's failure to address Defendants' governmental immunity argument in his response constitutes a waiver of any argument he may have.  *See Mitchell v. ConAgra Foods, Inc.*, 448 F. App'x 911, 914 (11th Cir. 2011) (holding that the plaintiffs waived their argument by failing to respond to the defendant's motion for summary judgment); *Flynn v. Sandahl*, 58 F.3d 283, 288 (7th Cir. 1995) (stating that a non-movant's failure to respond to a motion for summary judgment "constitutes an admission by the non-movant that there are no disputed issues of genuine fact warranting a trial").

Even absent a waiver by Ritchie, the Court concludes that Defendants are entitled to summary judgment on Ritchie's state law claims on the basis of governmental immunity. A lower-ranking official who seeks governmental immunity for an intentional tort must show (1) that his acts were undertaken during the course of employment and he was acting, or reasonably believed he was acting, within the scope of his employment; (2) the acts were undertaken in good faith, or were not undertaken with malice, and (3) the acts were discretionary, as opposed to ministerial. *Odom v. Wayne Cnty.*, 482 Mich. 459, 480, 760 N.W.2d 217, 228 (2008). "Good faith" is a subjective test, under which a defendant is subject to liability only if he acted with "malicious intent." *Id.* at 482, 760 N.W.2d at 229. There is no issue that Defendants were acting in the course of their employment as police officers when they arrested Ritchie, nor is there any dispute that Defendants' acts were discretionary and not ministerial. As for the remaining factor, the Court concludes that a reasonable jury could not conclude that Defendants acted with malicious intent. While the evidence is more than adequate to show that Defendants' conduct was objectively unreasonable, there is insufficient evidence to show that Defendants, who responded to Kerr's request to remove Ritchie because she did not want him on the premises, acted with malice or ill-will toward Ritchie's rights.

## V. CONCLUSION

For the foregoing reasons, in case number 1:11-CV-530, the Court will grant in part and deny in part the School District Defendants' Motion for Summary Judgment. The motion will be granted as to Ritchie's OMA claim in Count VI against the School Board and his claim for punitive damages against the School Board and denied in all other respects. The case will continue on the claims against Iveson, Disler, and the School Board in Count I; the claims against Disler and the School Board in Count II; the claims against Kerr and the School Board in Counts III and IV; and the claim against Iveson in Count IX.

43

In case number 1:11-CV-616, the Court will grant in part and deny in part the City Defendants' Motion for Summary Judgment.  The motion will be granted as to Ritchie's state-law claims of false arrest and malicious prosecution in Count VII and his request for a declaratory judgment in Count VIII and denied in all other respects.  The case will continue on the claim against Corporal Miller in Count I, limited to a violation of Ritchie's First Amendment right to attend the July12, 2010 School Board meeting; the claims in Counts IV and V against Officers Thornton and Eastmead and Corporal Johnson; and the claims in Counts II and III against the City, to the extent Ritchie alleges municipal liability for the claims against the individual Defendants in Counts I, IV and V.

An Order consistent with this Opinion will issue.


Dated:  May 22, 2013                                    _____/s/ Gordon J. Quist_____
                                                                          GORDON J. QUIST
                                                                  UNITED STATES DISTRICT JUDGE